Good morning, Your Honors. Good morning. May it please the Court. Amir Mostafavi for Warren-Mauran Plaintiff, NFL. The burden-shifting frameworking standard used by the lower court provided by the Celotex Corp. v. Catrad in 1986 U.S. Supreme Court was not followed. Which case? I'm sorry, I'm having trouble. Celotex Corp. v. Catrad, 1986 U.S. Supreme Court case. The Celotex case requires that if the party, the moving party, does not have the ultimate burden of the proof, has to meet the initial proof by providing either negating the essential elements of the case or showing that the opposing party cannot meet its burden to establish the element of the essential elements. Wal-Mart did not meet the initial burden, and the lower court did not have any issue with that. Assuming that Wal-Mart did meet the initial issue, then the burden would have been shifted to the plaintiff to establish that there was a genuine issue of material fact. Well, this is how I understand it. So are you still arguing that McDonnell-Douglas burden-shifting shouldn't apply here? Yes, Your Honor. As the initial matter that the McDonnell-Douglas burden-shifting should not be started with. I think it would be more useful to go on the premise that it does apply. Yes, I agree. Because I thought that you started your argument with the premise that McDonnell-Douglas does apply. It does. The plaintiff's position is that we had provided the lower court with enough direct evidence that under which... Well, you have some direct evidence, but it's not direct evidence that connects up sufficiently by itself. So it's useful evidence in the McDonnell-Douglas context, but I don't think it's worth putting a lot of energy into the question of whether you can win on it alone. I mean, the original hiring doesn't seem to connect up to anything, and the Wysocki thing does connect up perhaps more than you've even argued. But it wasn't in the hiring. He didn't say, I'm going to fire you because of your age, although Smith says that he was saying it to him at an earlier point. So you have a pretty good case, but to stand directly on it isn't necessary. And it's not going to work very well. So I'd rather go on to the other context. Understood, Your Honor. Okay, so you did a prima facie case of age discrimination, and then Walmart says, no, we had two legitimate nondiscriminatory reasons in the incidents arising from, I guess, the August 2014 event that violated policy and the July 2015 event that there was a violation of policy. And then you come back and you have to say, no, they said that, but that was pretext. So I think we have to focus on what evidence do you have of pretext that they really fired your client because of his age, not because of these write-ups. Yes, Your Honor. The 2014 coaching was directed, instructed, and mandated by Wysocki, who had already provided direct discriminatory remarks to plaintiff's supervisor, telling him to get rid of this guy. He's too old. But Mr. Smith's declaration, Mr. Smith, the supervisor at issue, that declaration doesn't say that Mr. Wysocki told him to investigate the August incident or to issue a coaching because Mr. Wysocki wanted to have Mr. Moran terminated because of his age. Mr. Smith says that at some other unidentified point in time, Mr. Wysocki made statements that evidenced animus based on age, age discrimination, but he doesn't tie it to this incident that occurred, which, as I understand from the record, was videotaped, and there were numerous statements from the various employees who were involved. So Mr. Wysocki concluded there was a violation of the policy, the Walmart policy, on detaining suspected shoplifters. And so I think what you need to do is show us how Mr. Wysocki's decision that there was a violation of policy and that that was reason to issue a coaching, a disciplinary action, was pretext really for his age discrimination. Sure, Your Honor. Mr. Wysocki did not investigate. Had Mr. Smith to investigate, Mr. Smith investigated the violation, the incident, interviewed with some of the eyewitnesses, and concluded there was no violation of the policy. But then Mr. Wysocki testified that he also violated, reviewed the statements and reviewed the video. So I don't think Mr. Smith can counter that. He wouldn't have any personal knowledge of whether Mr. Wysocki viewed the video. That is correct. Mr. Wysocki says, I want to coach this individual regardless of your conclusion. And if you don't coach him, I will coach both of you. Can you tell me where that particular statement is in the declaration? I'm not sure I saw it. I mean, the Smith declaration is certainly pretty good and in some ways useful evidence for you. But where is that particular statement? I don't have the pagination for that statement. But Mr. Wysocki told Smith that if you refuse to coach him against my will, then I will coach not only him and you. Well, that's there, but not this. Where is the statement that no matter what, I want to coach him? And then also the ‑‑ Are you telling me that doesn't exist even though you just said it did exist? It does exist, Your Honor. Where is it? You don't know? I don't have the pagination number, Your Honor. All right. Well, I couldn't find it. And after the coaching, the 2014, which has only one year of the expiration, right before the expiration of 2014, because Mr. Smith has left the company, which was his shield from discrimination by Wysocki, when his cat paw came in, Ms. Schneibel ‑‑ Ah, the cat's paw. Okay. So this was interesting. Your theory is that although Mr. Wysocki had been transferred to another region, no longer worked or supervised the store where Mr. Moran worked, and Ms. Schneibel had come in and taken that position, that Ms. Schneibel was actually influenced by Mr. Wysocki's prejudice that she was his cat's paw. But I didn't see any evidence of that other than speculative arguments in the brief that they must have spoken to each other or this is how companies operate. Can you point to anything in the record that would substantiate that Mr. Wysocki ever spoke to Ms. Schneibel or attempted in any way to influence her decisions? There is no record directly that says that these two have talked, but knowing that Walmart is the largest employer in the world and knowing that the managers move quickly. Just a couple things. First of all, there is some evidence that they did talk when she first came on about this person in particular, I think. But leaving that aside, this is what I don't understand. As I understand the policy, he couldn't have gotten fired except for the ‑‑ he was only disciplined the second time for not reporting. That's what the form says. Not just what they told him, but what the official form says. And as I understand it, the only reason, it was only because he already had a third level. Exactly, Your Honor. It was directly in a line of causation. They didn't have to talk to each other. That's exactly showing that. Because it was only a month before expiration of the first one, they had to go and create the second coaching so they can be firing him. But even if they didn't correct the second coaching projectually, and we can get to that, the first one was still unnecessary. It was the reason he got fired when he got fired. The first one was they put ‑‑ Wasowski put him on the highest degree of the coaching. Therefore, with a one-shot counseling the second time, he was going to get fired. Exactly, Your Honor. But the policy says that Walmart can advance a person through more than one level of coaching for an incident. So I agree with the premise of Judge Berzon's question that when he was terminated for the second policy violation of what Walmart characterizes or claims as a policy violation, that happened because he had already been put on a third coaching. But the policy states that Walmart could place him on a third coaching based on a policy violation. And that first incident involves a suspected shoplifter who becomes violent. And Mr. Moran does not dispute that he held on to her, propelled her down a corridor, took her into a locked room and essentially sat on her, held her down. And so it seems reasonable for Walmart to conclude, as they say in the record, that that was sufficient for a third coaching. But then Mr. Wasowski is gone. And I believe Judge Berzon is correct that Mr. Wasowski spoke to Ms. Schnabel when she came on because she asked him if he had conducted an investigation because Mr. Smith claimed that he did not. And she's – he said that he did and that was the end of it. But there's nothing that ever suggests they spoke again about Mr. Moran. Yes, Your Honor. On the 2014 incident, the shoplifting that Your Honor mentioned, it's a disputable fact or issue as whether or not Moran acted as a self-defense of himself and also other associates and also there was another suspect in that room. So you're arguing essentially that the supervisors were incorrect, that his interpretation of his actions was reasonable and that he could do the things that he did when a suspect or – a suspected shoplifter became violent. But isn't there case law that says that's not sufficient, that when you're looking at pretext, the issue is – and particularly with an alleged violation of policy, the issue is whether the employer honestly believed the reason, not whether they were correct. There are two responses to that, Your Honor. First of all, the first response is we asked a police detective with about decades of the criminal investigation. But he's a person you're offering for expert opinion who's going to comment on whether Walmart was correct or not. How does that change the law that it's whether they honestly believe their reason, not whether they're correct? So as the trial – as the district court mentioned that the Wasowski – or Moran failed to show that Wasowski subjectively believed on his conclusion. How could someone subject – can prove that somebody's subjective mind between the ear is one or another? Well, there's all sorts of things you can argue. And you've already argued one of them, which is suspicious timing. Another factor would be treating other employees differently. But here Mr. Wasowski also recommended the termination of a younger employee, which suggests that he believed that there were policy violations. But at the same time, they have hired younger employees, female employees, and against all the conclusions that Mr. Smith made, they decided to coach him. And not only to coach him for a person who has multiple years of experience as a trainer for other asset protection unit individuals, but also he had excellent record. But they didn't terminate him for poor performance. They didn't say he's not showing up, he's not doing his job, he's not training others. They coached him for a policy violation and then ultimately terminated him for a policy violation. And a person could have a policy violation even if they'd been previously exemplary employees. Isn't that correct? Yes, Your Honor. But they put him on the verge of termination. Basically when Mr. Moran contested the third level of coaching, what he was told is you are an excellent employee, you haven't done anything wrong in violation of any policy. In fact, you are the enforcer of the policy and you're going to be fine. This is something that Mr. Wasowski wants to do. Let him to have his wish. And this is from Mr. Smith's testimony. Yes, Your Honor. And let this coaching go to the one year of expiration and you're going to be fine. However, before the one year expiration, about maybe a month before that, they pulled the plug. They created the second coaching. But you don't have very good direct or you don't have any direct evidence of that timing, of them choosing that timing, right? I mean you just make that surmise. It has to be, yes. And the reason is that when Lewis was on the apprehension unit before the monitors, he would see all the associates. He would see Jones, Villanova, and Moran that they have formed a triangle, that Villanova was behind the suspect on the cashier line and Moran was outside, had no eyesight with the suspect or any of Villanova. And this one, this is what I don't understand. It is clear from the APO 9 violation in the report and what they told him when he was fired, both, was that he was fired for not reporting. He was not fired. He was coached for not reporting. They don't say anything about coaching him for not having continual, for not meeting the four factors. I'm sorry. And what I don't understand is that my understanding of what happened here was that there was no time in which he could have reported. In other words, he was immediately, as soon as they got back, the APM said this was a bad stop and then they had a meeting about it. So there was no time gap there. Right. And that's the inconsistency. But you never made this point anywhere in your briefs. We should have had, and if I haven't, I apologize. You should have. Yes, Your Honor. The inconsistency of this shows that they really were quick in terms of firing Moran. So they did not have the facts. They wrote him up for something that doesn't seem to make any sense. It does not. It does not. But you never said any of that. I believe we have said that he came in and he said we investigated. And under the policy APO 9, he does not have to have individually eyesight on the suspect. And they never, and that isn't what they wrote him up for, probably for that reason. Exactly. That isn't what, that isn't the reason that they fired him, that they coached him, either according to the report from Shannon Schnabel or what they told him. Right? Yes. And Lewis came and said you had a bad stop. Moran says, no, we investigated. And when we find that there is no stolen merchandise, we thank him. We apologize for taking his time. And he was really grateful because he would find his receipt. And it was nothing really offensive to the suspect. He went. But there was no harm, no foul at that moment. In the Schnabel report to Mr. Betty, Mr. Steve Betty, I may not be pronouncing that correctly, B-E-D-I. Yes, Your Honor. She wrote a memo to Mr. Betty, who is her supervisor, outlining the statements of the various employees, her review of the videos, violations at issue. And I think Judge Berzon is referring to what is page ER 2098, which lists an APA violation for not reporting a nonproductive encounter for Mr. Moran. And then when it gets to her recommendations, she lists multiple AP-09 violations. Was Mr. Moran, did he at any point not understand that he was supposed to keep visual contact with a suspected shoplifter? If he is the only APA responsible for investigation, yes. However, when they were on the monitor room, when the other APA sensed and said that we have a situation, there were two other APAs were on that room, including Mr. Moran, APA Villanova and APA Moran. So at that moment, they said, all right, so let's go down on the floor. Villanova goes, follow the suspect to the line, stand behind maybe a few feet from the suspect, and Moran, you go outside, hide yourself somewhere that nobody can see you, and then we're going to give you the signal. Luis was on the room at that time, asked Ms. Jones to leave. Ms. Jones said, if I leave, I lose my eye contact on the monitor.  So at that time, nobody had any concerted communication. Jones came to the floor. So that means that Mr. Moran did not get the signal or have confirmation, right? So he stopped the person. No, he didn't. At that time, Mr. Moran did not know that Luis had instructed Jones to leave the room coming to the floor. So to simplify this, can you tell me where in the record Mr. Moran testified or somebody said that he had confirmation that there had been a visual confirmation of the person leaving the store with merchandise that he hadn't paid for? Because as it turned out, the person didn't do that, right? So when they took him back in, he didn't have any items that he hadn't paid for. But where did Mr. Moran have any confirmation, even though he didn't have visual contact with the person, that that had happened? On his declaration, he stated that the only eyesight that he had was with Jones, which was one of the points of the triangle. It was Villanova who did the signal to APA Jones, who APA Jones signaled it to Mr. Moran. Where is this discussion of the signal? It's in Mr. Moran's declaration? He said that they agreed that she would nod her head, and she did. Exactly. All right, counsel, you are well over your time, so we're going to let Walmart's counsel respond. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Paloma Peracchio for Walmart Stores, Inc. Mr. Moran was terminated by Shannon Schneibel, and there's no evidence that Shannon Schneibel had any discriminatory intent. There's no evidence of any comment by her or her taking any action with age discrimination. Well, what about my question about the fact that he was – on both the official report from Schneibel to Betty and on the information they gave him, he was – what's the word in counsel? What's the word? Coached. Coached. For AP09 violations, concealment, Condita Jones, continued possession of merchandise, Condita Jones, APA not reporting NPI, Condita Jones, APA not reporting NPI, Warren Moran. And that was also what they told him when they said there was – they said the reason – the internal document said integrity, not reporting, something like that, right? So that was the reason for the coaching, right? The determination. And the coaching. Yes. Which led to the determination, right? Correct. Termination was technical. As I understand what happened, he went back into the store and he was immediately met by Marino, is that his name? Marinos. Who said this was a bad stop. So when was there time to not report anything? I think at the end of the day, whether Walmart was mistaken in how it handled this particular coaching – But for this one, I just don't – it just makes no sense to me. I don't understand how he could have not reported something that was directly observed by the guy and that there was no time not to report. Which would give you some pretext, at least. Although I don't know that's very important. And that's really what is important at this point. It could be that they put in the wrong thing in the form. Well, but they didn't just do it once. They did it more than once. Okay. That may be true. And that at the end of the day, even if the actual policy violation didn't occur when you terminate someone, that alone isn't enough for pretext. Not believing the reason isn't enough. Well, it may not be known enough, but it's relevant. It's absolutely relevant. However, you don't – that alone is not enough. You need something beyond that in order to prove that the – We're at summary judgment stage. So if that tends to – if it's a fact that tends to prove pretext, then wouldn't that fact preclude a grant of summary judgment in Wal-Mart's favor? It would go towards pretext, but Mr. Moran would also have to bring forth evidence of discriminatory intent. It's not enough to say the policy violation was incorrectly coded or, you know, the reason stated was not consistent with what happened. There needs to be something more than that in order to beat the burden of pretext. So Shannon Schneibel, as I said at the outset, there is no evidence of discriminatory intent on her part. The only way that she can be found to have any – have acted with any such intent would be through this cat's paw theory. And for the cat's paw theory to work – I don't see that it's a cat's paw theory. It's an interesting word. But here we know, because the policy says so, that the 2014 incident was absolutely essential to the fact that he got terminated when he got terminated. Right. He wouldn't have gotten terminated had that not happened. Right. So one doesn't have to speculate about the impact of that. We know the impact of that. Well, you're right, and that was – you're anticipating where I was going with this, which is for the cat's paw doctrine to apply, you have to establish that the supervisor with discriminatory intent, in this case Wazowski – Schneibel would have been the cat's paw for Wazowski in this case – you have to prove that Mr. Wazowski carried out an act with discriminatory intent intended to result in the adverse action that happened, which is the termination. So we have to go back to the coaching. But that's because you're calling it a cat's paw theory. I'm calling it – And that's the only – when he got fired, but for this earlier event. Therefore, if the earlier event was discriminatory – That's exactly what I'm saying. That's enough. Yes. That's what I'm saying. But it doesn't have to be discriminatory in the sense that he meant for him to get fired when he got fired. He wasn't even there anymore. But you do have to prove that the coaching in July of 2014 was discriminatory, which the record does not support. You do, but not – I thought you said you have to prove that he meant for him to get fired. Meant for the ultimate adverse – well, meant for an adverse act to be taken. But I don't think you need to prove that. You just have to prove that he gave him this three-stage coaching for a discriminatory reason. I think he needs to intend for – he needs to intend for discrimination, and discrimination exists when there is an adverse action caused by it. Well, it wasn't an adverse action. Isn't the coaching itself an adverse action? Yes, the coaching is an adverse action. Okay, so that's what Judge Berzant is pointing to. So the first coaching was an adverse action, and we have some evidence of Mr. Wazowski's discriminatory intent. Right, and so what the district court did and what that record supports is that if we assume that the only way we can find this termination is discriminatory is if we find that the third written coaching in July was discriminatory, we have to go through the analysis on the third written coaching. Okay. So they've argued direct evidence of discrimination. I think that the court has already advised that that's unlikely. There's no tie. Well, there is some direct evidence of animus. So there's evidence that Mr. Wazowski made a statement at some point to get rid of the old man. Oh, according to Smith several times. And other employees as well. Right, but direct evidence of discrimination is evidence that without any inference whatsoever proves discrimination. So discrimination is discriminatory intent, adverse action. No, we agree with that. We understand that. But the evidence of animus is very relevant to the circumstantial evidence of pretext. Yes, I agree. So then you have to go through the McDonnell-Douglas burden-shifting analysis on that third written coaching. So we assume a prima facie case is established by the fact that there's been discriminatory remarks by Mr. Wazowski. So now we get to Walmart's legitimate business reason. Walmart has submitted evidence that Mr. Moran physically engaged the suspect, which is inconsistent with policy. Mr. Moran admits that he physically engaged with the suspect and mounted the suspect, inconsistent with policy. Mr. Wazowski reviewed the evidence and made this conclusion. And therefore, we have articulated, we've carried our burden to articulate but not prove that we had a legitimate nondiscriminatory reason. Now the burden shifts back to Mr. Moran to prove that that reason is false or unworthy of credence, and the true reason is discrimination. All he has is these comments made at some point about get rid of that old man. But when you put that up against the fact that Mr. Wazowski— No, but you also have Smith's whole story about what happened. Well, the fact that Mr. Smith thinks that the— It's not what he thinks, but what did happen was that he was asked to do the investigation. He had some expertise of his own. He concluded that there was no violation. And although I cannot find the statement that was referred to where Wazowski said no matter what you have to do, I want you to get him, he said he did say that he—as I understand it, Wazowski did not himself write up the report. He dictated to Warren how to change his report different from what he actually found. And he told him that he should coach him to the maximum degree possible regardless of my findings. I mean, that's some evidence. It's pretty good evidence, unusually so from somebody who was right there. However, Mr. Wazowski terminated a 22-year-old in the same instance. Which is your strongest evidence, for sure. But that's for the jury. I think that ultimately the burden of pretext is such that it's not sufficient to say, well, there is some question of which way the policy could have gone. I think the evidence supports that Mr. Wazowski's conclusion that there was a violation of policy is reasonable. There is no disputing that Mr. Moran physically engaged with the suspect, and there is no disputing that that is a violation of policy. And it's a good policy. Right. So the fact that Mr. Smith is now testifying that he didn't see it as a violation of policy, well, that's not the same as, oh, we are going to, you know, discipline you for, you know, going into this file cabinet you're not supposed to go into, and then the evidence shows you didn't ever go into the file cabinet. That's obviously an egregious inconsistency because you didn't actually do the thing you're getting terminated for or you're getting coached for. In this situation, we have a person who was coached for physically engaging a suspect, and there is substantial evidence, video evidence, in fact, and an admission that he did it. So the fact that Mr. Smith sort of has a different interpretation of the policy isn't enough to completely undercut Walmart's legitimate business reason. Add to that the fact that Mr. Wazowski was well within his power to terminate Mr. Moran at that time based on the violation of policy and didn't. Add to that the fact that Smith says that Wazowski said several times, I want to get rid of that old man, then. Why didn't he get rid of him? Why? He had the opportunity and he didn't. That's the point. He made comments. If he made these comments about him being an old man, that's enough for the prima facie case. Well, he certainly set it up to be a lot easier to get rid of him. Well, it's enough for prima facie. I would say that's enough for a prima facie case. It's not enough to establish pretext given the evidence that Walmart has for its legitimate business reason and I think this evidence that the other associate involved who was much younger, 22 years old, was actually terminated for the same instance. I think you can't overcome it just by some comments that were made in an unknown time. So for Ms. Schneibel to have Mr. Wazowski's alleged discriminatory intent, you have to establish the third written coaching was discriminatory and the evidence doesn't support that and that's what the district court found. Check me to address the defamation. He didn't argue about it, so I don't know if the court wants to discuss that. It's all preserved. The thing I'm interested in, I'm concerned that the district court applied an incorrect legal standard in awarding the cost, which to me seems somewhat outrageous given the fact that this man is earning $13 an hour and it represents a quarter of his yearly income and the district court wholly failed to consider the economic disparity between the Walmart and this individual and also seem not to understand the significant chilling effect on the civil rights, future civil rights plaintiffs in this case. Well, you know, obviously the district court, you know, it's an abuse of discretion standard. Right, and if it commits an error of law, if by example, for example, he fails to apply the wrong legal standard, there's a five-factor test in this circuit. He only addressed two factors. And if he omits an understanding application of all five of the factors, then that's an error of the law and that satisfies abuse of discretion. Are you still standing by? Do you think that $6,000 plus was an appropriate award of cost here? Well, I think that the court didn't abuse its discretion in relying on the Save Our Valley case, which was a very similar set of circumstances of, you know, an award of $5,000 against a civil rights plaintiff with limited resources. I mean, I think that— Wasn't Save Our Valley an organization? I think it's an organization, yes. It was an organization. It was an indigent individual. But the Save Our Valley case also talked about cost and fees applied to an individual as well. So I read the district court's order. The district court laid out the applicable standard. It cited more than the Save Our Valley case, cited other cases, and relied on various factors to find that the award of cost should stand for Walmart. I don't see anything that suggests that the district court has to rely on five factors or more or that there's an exhaustive test and each factor is mandatory. So it would appear the district court knew the law and applied it, and if this court were to disagree on some of those factors, we would be substituting our judgment for the district court's, which is not a review for an abuse of discretion. Right. Well, I think that—I don't believe that the district court abused its discretion, and I believe that the district court made the appropriate ruling on that point, so I— I just wanted to give you a chance to defend the award. Thank you. Is there anything else Your Honors would like to be heard me to speak to? I don't think so. Thank you, Counsel. Thank you so much. All right. Thank you, Counsel. The case of Morin v. Walmart will be submitted.
judges: Wardlaw, Berzon, Bade